UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Morteza Katebian,

    Plaintiff,

v.                                        Case No. 18-13379

Arash Missaghi, Laila Alizadeh, Troy
Wilson, Skymark Properties SPE, LLC;
Skymark Properties II, LLC; Skymark     Sean F. Cox
Properties III, LLC; Liberty & York         United States District Court Judge
Corporation; and Skymark Properties
Corporation,

    Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Plaintiff Morteza Katebian alleges that Defendants Arash Missaghi, Laila Alizadeh, and Troy Wilson forged documents that purported to transfer his ownership interest in Defendant Liberty & York to Alizadeh. Katebian is particularly alarmed by this purported transfer because he personally guaranteed $20 million in loans for Liberty & York's subsidiaries with the understanding that he would own Liberty & York during the life of the loans.

In his complaint, Katebian seeks a declaratory ruling on whether he or Alizadeh owns Liberty & York, and alleges counts for common law conversion, statutory conversion, tortious interference, and civil conspiracy. Instead of answering, Defendants now move to dismiss all claims, except the declaratory ruling count ("Count I") as to Alizadeh. Defendants also move for summary judgment on all claims.

1

For the reasons below, the Court will partially grant and partially deny Defendants' motion. Specifically, the Court will only dismiss Katebian's tortious interference claim. The Court will also deny Defendants' motion to the extent it seeks summary judgment.

**BACKGROUND**

**I.      The Loans**

On August 1, 2016, Alizadeh transferred all of her ownership interest in Liberty & York to Katebian. Compl. ¶ 12. After this transfer, Katebian owned and controlled Liberty & York and its subsidiaries Skymark Properties Corporation; Skymark Properties II, LLC; Skymark Properties III, LLC; and Skymark SPE, LLC.[1] Compl. ¶ 15.

As the owner, Katebian helped Liberty & York's subsidiaries obtain financing. On December 30, 2016, Katebian approved a $17.35 million loan for Skymark II and Skymark SPE from Greenlake Real Estate Fund, LLC ("the Greenlake loan"). This loan was secured by a mortgage on property in Southfield, Michigan, and guaranties from Skymark II, Skymark SPE, and Katebian. Compl. ¶ 18-21. The Greenlake loan required that Katebian own all of Liberty & York during the life of the loan. (ECF No. 1-3, PageID 29).

On May 1, 2017, Katebian approved a $3 million loan for Skymark III from Security Plus Federal Credit Union c/o Extensia Financial, LLC ("the Extensia loan"). Compl. ¶ 24. This loan was secured by a mortgage on property in Morrow, Georgia, and Katebian's personal guaranty. Compl. ¶ 26-27. The Extensia loan required that there be no change in the ownership or management of Skymark III without Extensia's prior written consent. Compl. ¶ 28.

---

[1]Katebian also named the subsidiaries as Defendants in this case.

## II. The Transfer of Liberty & York Stock

At this point, the parties disagree about the facts. Katebian asserts that, "without [his] knowledge or consent, [Arash] Missaghi, Alizadeh, and [Troy] Wilson prepared and/or caused to be prepared, documents purporting to transfer Katebian's ownership interests in Liberty & York [and its subsidiaries]." Compl. ¶ 29. Katebian further states that, "having gained control of the [assets] belonging to Liberty & York [and its subsidiaries], Missaghi, Alizadeh, and Wilson diverted those funds for their own use and benefit." Compl. ¶ 31. The transfer and diversion of funds, Katebian asserts, caused the Libery & York subsidiaries to default on their loans. These defaults, in turn, caused the "potential liability and/or default of Katebian's loan guarantees." Compl. ¶ 35.

In response, Defendants offer the documents that, presumably, Katebian references in his complaint as forged. Defendants have provided "minutes from the July 14, 2017 meeting of the sole shareholder and the sole member of the Board of Directors of Liberty & York Corporation." (ECF No. 11-2, PageID 181). These minutes reflect that Katebian "consented to and authorized" (1) the transfer of his "entire right, title and interest in his shares of [Liberty & York]" to Alizadeh, and (2) his resignation as director. Defendants claim that Katebian signed the minutes. Defendants also provide an "acknowledgment" that was executed in lieu of Liberty & York's November 17, 2017 shareholder meeting. In this acknowledgment, Katebian "disclose[s] that he held the shares of Liberty and York in trust for Laila Alizadeh. The trust was held confidentially by and among the parties, Morteza Katebian and Laila Alizadeh." (ECF No. 11-3, PageID 185). Defendants claim that Katebian also signed this document.

Defendants also provide a series of emails, sent from Katebian's account between January 28, 2018 and April 6, 2018 (ECF Nos. 19-2 through 19-9), which they argue show that Katebian

3

"was aware of the circumstances and acknowledged that he had no ownership interest in Liberty and York." (ECF No. 9, PageID 550).

In a sworn affidavit, Katebian denies having signed the minutes or acknowledgment. *See* Katebian Aff. ¶ 7-10 (ECF No. 15-6, PageID 491). Katebian also argues that the emails show that he sought to be replaced as a guarantor, but intended to retain ownership and control of Liberty & York until he was replaced. Katebian Supp. Aff. ¶ 38. (ECF No. 25, PageID 628).

### III. This Lawsuit

Katebian filed his complaint on October 29, 2018. (ECF No. 1). In Count I, Katebian seeks a declaration that he is the sole owner of Liberty & York. Katebian also alleges counts for common law conversion, statutory conversion, tortious interference, and civil conspiracy.

Without answering the complaint, Defendants filed a motion to dismiss and for summary judgment. As the title suggests, Defendants' motion is twofold. In the first part, Defendants move to dismiss all claims, except Count I as to Alizadeh. In this part of the motion, Defendants argue that (1) the conversion claims should be dismissed because intangible "ownership interests" cannot be converted; (2) the tortious interference claim should be dismissed because Katebian lacks standing and does not allege that Defendants' actions were malicious or improper; (3) the conspiracy count must fail because there was no underlying tort; and (4) the Corporate defendants, Wilson, and Missaghi, should be dismissed from Count I because they do not have legal interests adverse to Katebian.

In the second part of the motion, Defendants move for summary judgment on the "entire complaint," citing the minutes and acknowledgment allegedly signed by Katebian and concluding that "he cannot possibly convince the Court that control over Liberty & York was wrested from him

4

involuntarily." (ECF No. 11, PageID 163).

## ANALYSIS

### I. Applicable Standards

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. The Court must construe the complaint in the light most favorable to the plaintiff and accept its allegations as true. *DirectTV, Inc. v. Treesh*, 487 F3.d 471, 476 (6th Cir. 2007). To survive a motion to dismiss, the complaint must offer sufficient factual allegations that make the asserted claims plausible on their face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Legal conclusions couched as factual allegations will not suffice. *Rondigo, LLC v. Township of Richmond*, 641 F.3d 673, 670 (6th Cir. 2011). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

The parties agree that Michigan law governs in this case. Accordingly, the Michigan Supreme Court is the controlling authority. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). If the Michigan Supreme Court has not decided an issue, then the Court "must ascertain the state law from all relevant data." *Orchard Grp., Inc., v. Konica Med. Corp.*, 135 F.3d 421, 427 (6th Cir. 1998) (citations omitted). "Relevant data includes state appellate court decision, supreme court dicta, restatements of law, law review commentaries, and majority rule among other states." *Id*.

## II. Motion for Summary Judgment

At the outset, the Court can dispose of Defendants' argument that, because of the documents they produced, they are entitled to summary judgment on all claims. Katebian swears that he did not sign or create these documents. "[W]hether [a] note is a forgery is a question of fact, and [c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment; rather, the evidence should be viewed in the light most favorable to the non-moving party." *Smith v. Weers*, 2018 WL 2087122 at *3, n.1 (6th Cir. January 2, 2018) (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014) (internal citations omitted). Katebian also provides alternative explanations for the emails. Viewing the evidence in the light most favorable to Katebian, there is a genuine issue of material fact as whether the minutes and acknowledgment were forged. Thus, the Court will deny Defendants' motion to the extent it seeks summary judgment.

## III. Motion to Dismiss

### a. Count I: Declaration as to Corporate Defendants, Wilson, and Missaghi

Defendants seek to dismiss Count I as it applies to the Corporate Defendants, Wilson, and Missaghi, arguing that these parties do not have legal interests adverse to Katebian. In response,

Katebian argues that "[d]eciding who owns and controls the entities without making them parties may well impair the entities' ability to protect their respective interests in their own governance and actions." Katebian also contends that his "rights in the entities could be impaired by Alizadeh, Missaghi and Wilson's continued portrayal of their ownership and control." Katebian concludes that, at the very least, these defendants are permissive parties under Fed. R. Civ. P. Rule 20(a)(2).

Rule 20(a)(2) governs when multiple defendants may be joined in one action: "[p]ersons ... may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."

In Count I, the issue is whether Katebian or Alizadeh owns Liberty & York. This issue, in turn, depends on whether Alizadeh, Missaghi, and Wilson conspired to fraudulently transfer Katebian's ownership interest. The allegedly fraudulent transfer satisfies both of Rule 20(a)(2)'s requirements because (1) Katebian seeks relief against Missaghi, Wilson, and the Corporate Defendants for alleged harm arising from this transaction, and (2) it is a question of fact or law that is common to all defendants and that will arise in the action. Thus, Missaghi, Wilson, and the Corporate Defendants may be joined in Count I.

b.  **Counts II and III: Common Law and Statutory Conversion**

"Under the common law, conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip. Inc. v Columbian Distribution Services, Inc.*, 497 Mich. 337, 346 (2015) (internal citations omitted). Statutory conversion, as provided for in Mich. Comp. Laws § 600.2919a(1)(a), requires

7

an additional element—"that the defendant employed the converted property for some purpose personal to the defendant's interests." *Id*. at 361.

Defendants argue that Katebian's complaint cannot support either common law or statutory conversion because he alleges that Defendants "knowingly and wrongfully exercised dominion and control over [his] *ownership interest*s in Liberty & York." Compl. ¶ 41. (emphasis added). Defendants argue that, because stock ownership is intangible, it cannot support a conversion claim.

The Michigan Supreme Court has not directly examined whether property must be tangible for a conversion claim to be viable. The Michigan Court of Appeals, however, has described a trend toward recognizing the conversion of intangible property:

> What property may be the subject of an action for conversion was at first determined on the basis of the fiction of losing and finding. Any tangible chattel could be lost and found, and so could be converted....
>
> Intangible rights of all kinds could not be lost or found, and the original rule was that there could be no conversion of such property. But this hoary limitation has been discarded to some extent by all of the courts. The first relaxation of the rule was with respect to the conversion of a document in which intangible rights which were merged, so that the one became the symbol of the other-as in the case of a promissory note, a check, a bond, a bill of lading, or a stock certificate. This was then extended to include intangible rights to which a tangible object, converted by the defendant, was highly important-as in the case of a savings bank book, an insurance policy, a tax receipt, account books, or a receipted account.
>
> In all of these cases, the conversion of the tangible thing was held to include conversion of the intangible rights and to carry damages for it. The final step was to find conversion of the rights themselves where there was no accompanying conversion of anything tangible-as, for example, where a corporation refuses to register a transfer of the rights of a shareholder on its books.
>
> The doctrine of conversion has not extended beyond the kind of intangible rights which are customarily merged in, or identified with, some document or other tangible property.

*Sarver v. Detroit Edison Co.*, 225 Mich.App. 580, 585-586, 571 N.W.2d 759, 762 (1997) (citing

Prosser & Keeton, Torts (5th ed.) § 15, p. 90-92). "Michigan appellate court have held that certain intangible property can be the subject of a conversation action." *Id.* (citing *Warren Tool v. Stephenson*, 11 Mich.App. 274, 276, 161 N.W.2d 133 (1968) (negotiable instrument); *Tuuk v. Andersen*, 21 Mich.App. 1, 13, 175 N.W.2d 322 (1969) (right to lease a machine); *Miracle Boot Puller Co., Ltd. v. Plastray Corp.*, 57 Mich.App. 443, 451, 225 N.W.2d 800 (1975) (patent right)). The *Sarver* court also noted that, in the cases where intangible property has been recognized as actionable, "plaintiff's ownership interest in intangible property was represented by or connected with something tangible." *Id.*

Here, Katebian attached an executed stock transfer agreement, which provided that Alizadeh would transfer a stock certificate. Katebian alleges that Alizadeh did, in fact, complete this transfer. Further, an ownership interest is an intangible right that is customarily merged into or identified with, a tangible stock certificate. *See Sarver.* 225 Mich.App. at 586. Finally, the Michigan Supreme Court appears to have recognized a cause of action for conversion of shares of stock, regardless of whether the corresponding, tangible share certificates were converted. *See Daggett v. Davis*, 53 Mich. 35, 18 N.W. 548, 549 (1884) ("But we see no reason why, if the shares are converted by means of a wrongful use of the certificate, the owner in suing may not count upon the conversion of *either*.") (emphasis added). Thus, the Court concludes that, under Michigan law, an intangible ownership interest may support a common law or statutory conversion claim.

Next, Defendants argue that, as to the statutory conversion count, the Complaint does not allege that Defendants converted the stock ownership "for their own use." However, in Paragraph 45 of the Complaint, Katebian alleges "[b]y their wrongful actions described in this Complaint Missaghi, Alizadeh, and Wilson knowingly and wrongfully exercised dominion and control over

9

Liberty & York [and its subsidiaries] *for their personal use and benefit*..." (emphasis added).

Further, Plaintiff alleged that "[h]aving gained control of the respective accounts and case belonging to Liberty & York [and its subsidiaries], Missaghi, Alizadeh and Wilson diverted those funds for *their own use and benefit*." Compl. ¶ 31.

Thus, the Court concludes that the Complaint alleges plausible claims for common law and statutory conversion.

### c. Count IV: Tortious Interference

Although Count III is styled simply as "tortious interference," Katebian appears to be alleging a claim for tortious interference with a contract or contractual relationship. *See* Compl. ¶ 52 ("By their wrongful and tortious conduct...Missaghi, Alizadeh, and Wilson have tortiously interfered with the contract existing between Katebian and Greenlake..."); Compl. ¶ 53 ("By their wrongful and tortious conduct...Missaghi, Alizadeh, and Wilson have tortiously interfered with the contract existing between Katebian and Extensia...").

In Michigan, "[t]he elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Knight Enterprises v. RPF Oil Co.*, 299 Mich.App. 275, 279 (2013).

Katebian's tortious interference claim can be summed up briefly: He owned Liberty & York. Liberty & York subsidiaries entered into loan agreements with Greenlake and Extensia. These loans required that Katebian own Liberty & York during the life of the loan. Defendants converted Katebian's ownership interest, thereby breaching the loan.

Although Defendants' motion is difficult to follow, they seem to challenge Katebian's

standing to bring this claim.² In sum, Defendants argue that Katebian cannot bring a claim for tortious interference with a contractual relationship because he was not a party to the contract.

In Michigan, "the law treats a corporation as entirely separate from its shareholders, even where one person owns all the corporate stock." *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich.App. 463, 473-474 (2003). "The doctrine of standing provides that a suit to enforce corporate rights or to redress or prevent injury to a corporation, whether arising from contract or tort, ordinarily must be brought in the name of the corporation, and not that of a stockholder, officer, or employee." *Id*. at 474.

In this case, Katebian was not a party to either the Greenlake loan or the Extensia loan. His involvement was limited to signing on behalf of the corporation, and providing a personal guaranty. *See* Compl. ¶ 16-28. Because his authorized signature only bound the entity, Katebian can only bring a tortious inference claim to the extent one is available to him as guarantor.

In order for a guarantor to bring an individual action, he must show "(1) that the wrongdoer owed a special duty personal to him in his capacity as a...guarantor, or (2) that the injury suffered is personal to him as a...guarantor and distinct from the injury suffered by the corporation itself." *Levin v. Thorn Apple Valley, Inc*., 1998 WL 1988715 at *3 (Mich. Ct. App. 1998).

Katebian has not pled sufficient facts for the Court to conclude that either of these requirements is met. First, there is no indication that Missaghi, Alizadeh, or Wilson owed a special duty to Katebian in his capacity as guarantor of the loans. Second, the injury that Katebian alleges

---

²Defendants also argue that Katebian failed to allege the "intentional doing of a *per se* wrongful act or the doing of a lawful act with malice and unjustified in law." However, Katebian clearly alleged that Defendants tortiously interfered with a contractual relationship by "converting [his] ownership interests in Liberty & York." Compl. ¶ 52, 53.

11

that he suffered (i.e. having liability for the loans accrue against him, Compl. ¶ 54) is not distinct from the injury suffered by the relevant corporation. Thus, Katebian has not pled facts that support a plausibe claim for tortious interference with a contractual relationship.

        **d.**        **Count V: Civil Conspiracy**

In Count V, Katebian accuses the individual Defendants of civil conspiracy. "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich. App. 300, 358 (1992). A plaintiff asserting civil conspiracy must also demonstrate some underlying tortious conduct because civil conspiracy is not an independently actionable tort. *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 257 Mich. App. 365, 383 (2003).

Katebian alleges that "Missaghi, Alizadeh and Wilson illegally, maliciously, and wrongfully conspired with one another with the intent to, and for the illegal purpose of, obtaining Katebian's ownership interests." Compl. ¶ 58.

Defendants first challenge this allegation by stating "[s]ince there is no underlying tort, there is no conspiracy." (ECF No. 11, PageID 173). Because the Court concludes that Katebian sufficiently alleged claims for conversion, this argument is unavailing.

Next, Defendants argue that, under the intracorporate conspiracy doctrine, the individual Defendants cannot be liable for conspiring with their own corporation. But the clear language of Count V shows that Katebian is accusing only Missaghi, Alizadeh, and Wilson of conspiring. The Corporate Defendants are not co-conspirators; they are the objects of the conspiracy. Thus, Defendants' arguments against the civil conspiracy claim are unpersuasive.

## CONCLUSION AND ORDER

For these reasons, the Court **DENIES** Defendants' motion to the extent it seeks summary judgment; **DENIES** Defendants' motion to the extent it seeks dismissal of the Corporate Defendants from Count I, the dismissal of the conversion claims, and the dismissal of the civil conspiracy claim; and **GRANTS** Defendants' motion to the extent it seeks dismissal of the tortious interference claim.

**IT IS SO ORDERED**.

Dated: April 8, 2019	s/ Sean F. Cox
	Sean F. Cox
	U. S. District Judge