UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Morteza Katebian,

    Plaintiff,

v.                                        Case No. 18-13379

Arash Missaghi, *et. al.*,           Sean F. Cox
                                                        United States District Court Judge

    Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this shareholder dispute, Plaintiff claims that he is the rightful owner of a real estate development company, and that Defendants stole his ownership interest by forging corporate documents. Defendants have moved for summary judgment, arguing that Plaintiff was never the true owner of the company and that he transferred the nominal rights that he did have. To substantiate these arguments, Defendants provide documents that they purport were signed by Plaintiff, and emails that they purport were sent by Plaintiff. For his part, Plaintiff provides his own sworn affidavit that denies signing these documents or sending these emails.

Because there are genuine issues of material fact that require the assessment of witness credibility, the Court will deny Defendants' motion for summary judgment.

### FACTUAL BACKGROUND

Defendant Laila Alizadeh is a commercial real estate developer. Her husband, Defendant Arash Missaghi, is her "consultant." Alizadeh and Missaghi employ Defendant Troy Wilson to manage some of the properties that they have developed.

1

In 2012, Alizadeh, through the her wholly owned corporation Defendant Liberty & York, purchased property in Southfield, Michigan. In 2014, Liberty & York purchased property near Atlanta, Georgia. Led by Wilson, Skymark Properties Corporation—a wholly owned subsidiary of Libery & York—performed property management functions, such as collecting rent, for these properties. Other Skymark entities (of which Skymark Properties Corporation was the sole member) took title to these properties and granted various mortgages.[1]

In 2016, the Skymark entities had to refinance their mortgages on the Southfield property and the Atlanta Property. For the Southfield property, Skymark negotiated a new mortgage with Greenlake Real Estate Fund, LLC. For the Atlanta property, Skymark negotiated a new mortgage with Extensia Financial, LLC.

The Greenlake mortgage required that Skymark be owned by someone with a United States Social Security Number. This was a problem for Alizadeh and Missaghi because both are Canadian citizens. So Missaghi turned to Plaintiff Morteza Katebian (a mortgage broker who had been a friend of his late father) because Katebian had a U.S. green card and a Social Security number.[2] On August 1, 2016, Alizadeh and Katebian executed a stock transfer agreement that transferred total ownership of Liberty & York to Katebian. (Def.'s Mot., Ex. D).

Although nobody disputes that the August 1, 2016 share transfer was valid, the parties do dispute its practical effect on the ownership of Liberty & York and the Skymark subsidiaries. Defendants allege that, when Katebian and Alizadeh executed the transfer agreement, they

---

[1]Some of these Skymark entities have been named as Defendants in this case.

[2]Katebian alleges that he was recruited as a stand-in not only because he had a Social Security Number, but also because Missaghi had "virtually no assets" and was facing fraud-based criminal charges in Canada.

2

simultaneously executed a trust agreement that required Katebian to hold the shares of Liberty & York as a trustee, with Alizadeh as the sole beneficiary. The trust agreement acknowledged that Katebian "otherwise has no legal or beneficial interest or claim to the shares," and that "all of attributes of the beneficial ownership of the [shares] shall be and remain in" Alizadeh. (ECF No. 73-8, PageID 1613).

Defendants provide a copy of this trust agreement, which appears to be signed by Katebian and Alizadeh, and witnessed by Wilson and Missaghi. (ECF No. 73-8). In response, Katebian denies having ever agreed to hold the shares of Liberty & York in trust for Alizadeh. (ECF No. 77-7, PageID 2097-2098) (Katebian Aff. ¶ 6) ("I never agreed to hold the shares of stock of Liberty & York merely in trust for Defendant Laila Alizadeh. . .").

Now the owner of Libery & York and the *de facto* owner of its Skymark subsidiaries, Katebian executed several corporate documents that secured mortgages from Greenlake and Extensia. (ECF No. 77-2). These documents uniformly identified Katebian as Liberty & York's sole director and shareholder. The Greenlake mortgage secured a loan of $17.35 million and the Extensia mortgage secured a loan of $3 million. Katebian also personally guaranteed these loans. However, Defendants assert that "there was so much equity in the property that there was no actual risk" to Katebian.

Even though Katebian was the owner on paper, he did not exert control over Liberty & York's day-to-day operations. (Katebian Dep. 124:6-130:4). From an operational standpoint, Liberty & York and its Skymark subsidiaries continued to be controlled by Alizadeh, Missaghi, and Wilson.

In June 2017, Wilson contacted Liberty & York's corporate counsel, John Premo of the law

3

firm Kickham Hanley, requesting resolutions that would transfer ownership from Katebian back to Alizadeh. Premo prepared these documents and sent them to Wilson. (ECF No. 77-9). In a document titled "Minutes of the July 14, 2017 Meeting of the Sole Shareholder and the Sole Member of the Board of Directors of Liberty & York Corporation," Katebian appears to have transferred his interest in Liberty & York back to Alizadeh. (ECF No. 73-11). He also appears to have resigned as the sole director. Katebian denies signing or approving these minutes, and denies having transferred his ownership interest back to Alizadeh. (Katebian Aff. ¶ 6, 17)

Despite these minutes purporting to divest Katebian of all involvement in Liberty & York after July 14, 2017, Wilson continued to treat Katebian as a corporate authority. On October 18, 2017—three months after Defendants contend Katebian had transferred all stock back to Alizadeh—Wilson emailed Katebian, seeking his approval to transfer property from one Skymark entity to another. (ECF No. 77-8).

Another document from this timeframe is also relevant. Defendants provide an "Acknowledgment" of Liberty & York, dated November 17, 2017. In this acknowledgment, Katebian appears to acknowledge that he held the shares of Liberty & York in trust for Alizadeh. (ECF No. 73-12). However, the Acknowledgment also recognizes that "Morteza Katebian is the sole Shareholder of [Liberty & York]" and that he would continue to serve as the sole director "until the next annual meeting . . . until his successor has been duly elected and qualified, or until his resignation or removal." *Id.* Again, Katebian denies having ever held Liberty & York in trust for Alizadeh. (Katebian Aff. ¶6), or signing the November 17, 2017 Acknowledgment. (Katebian Aff. ¶ 17).

Until January 2018, Katebian was unaware of the July 2017 minutes or the November 2017

4

Acknowledgment, and believed that he—at least on paper—still owned Liberty & York. (Katebian Aff. ¶ 13). On January 28, 2018, Katebian emailed Missaghi and Wilson, requesting that they "replace [him] as a director and get [him] off the loans." (ECF No. 73-14). Katebian stated that he wouldn't "interfere with your operation, but [he] wante[ed] the mortgage payments to be the first payments to make" because he wanted to "protect [his] credit in the U.S." *Id*. The record does not contain any response to this email.

On January 29, 2018, Katebian again emailed Missaghi and Wilson. He stated that he was "not claiming any ownership in [their] company" and that he wouldn't interfere in their business "except for the loans which [he] gave personal guarantee [sic]" (ECF No. 73-5). He then threatened to contact Bank of America to change the Skymark entities' signing authorities. This threat was to get Missaghi and Wilson's attention. *Id*.

On January 30, 2018, Wilson emailed Katebian, stating that he does not respond to "leveraging, or angling, or threats." (ECF No. 73-13) ("Never have, never will.") Wilson then responded to Katebian's threat. He stated that he had "flown to LA and met with Green Lake in person and explained to them what [Katebian's] role was in the previous mortgage and also explained to them that absolute control over the US entity is and always been [Alizadeh]. [He] also [had] done the same with Extensia. [He] also had the minute book for the corporations updated to reflect the removal of [Katebian's] status as a director." (ECF No. 73-13, PageID 1651).

Katebian immediately emailed Edward Kickham of Kickham Hanley to ask about his alleged removal as a director of the corporation. (ECF No. 73-17). Premo (Kickham's partner) provided the relevant documents. (ECF No. 73-18). Katebian replied, asking "who gave this document to you? Why didn't you double check with me before removing me? Did you inform the lenders?" (ECF No.

5

73-19). Kickham responded that they had received the documents from "Ara/Laila's office." (ECF No. 73-20, PageID 1666).

On February 2, 2018, Missaghi emailed Katebian, attaching a pre-drafted letter for Katebian to adopt as a retraction of his claims of wrongdoing against Liberty & York's corporate counsel. The pre-drafted letter read as follows:

> Gentlemen:
>
> Please disregard the emails that were sent to you regarding Liberty & York Corporation and its affiliates, in which I errantly made claims against John Premo and Kickham Hanley PLLC. It is my understanding that Mr. Premo, Mr. Kickham and the firm have always diligently and ethically represented Liberty & York Corporation and its affiliates. I hereby retract the emails sent to Mr. Kickham and Mr. Premo. Any claims or alleged claims contained therein are baseless.
>
> It is an irrefutable fact that I did not have any interest in Liberty & York Corporation but acted in my capacity as sole officer of the corporation. Since I no longer have any capacity in the corporation, I accept the fact that neither Mr. Premo nor Mr. Kickham will discuss, or be expected to discuss, the corporation's business with me.
>
> Again, my attacks against Mr. Premo and Mr. Kickham are unfounded, unwarranted, and meaningless. I admit and acknowledge that I have no claims or cuases of action against Mr. Premo, Mr. Kickham, or Kickham Hanley PLLC. And I further acknowledge that Mr. Premo, Mr. Kickham nor Kickham Hanley PLLC do not represent me in a personal capacity in any matters.
>
> I would only request that upon confirmation of my personal guarantees provided to Green Lake LLC and Extensia Credit Union being released in favor of Laila Alizadeh I would receive notice of the same forthwith upon my release of my personal Guarantee's.
>
> This retraction is being provided to you of my own free will, without the influence of any other party.

(ECF No. 73-21, PageID 1671)

Katebian responded to this email, telling Missaghi that he would talk to his lawyer, Jay Auerbach, on Monday. (ECF No.73-22). On Sunday, February 4, 2018, Missaghi again emailed

6

Katebian, stating that "nothing less than the email as per the attachment will be acceptable." (ECF No. 73-23).

On Monday, February 5, 2018, Missgahi emailed Premo and Kickham (with Katebian cc'd), stating that Katebian had until 4pm that day to retract his allegations of wrongdoing, and implying that legal steps should be taken if he did not meet that deadline. (ECF No. 73-24). Katebian responded to that email, stating that he was "still waiting for [Kickham]'s respond [sic]." (ECF No. 73-25). Kickham responded, stating that, in October 2017, Katebian's counsel had confirmed that Wilson was the contact person for company matters. So, when Wilson furnished signed documents that transferred control of Liberty & York back to Alizadeh, Kickham made the appropriate minute book change. Kickham stated that he was "at a loss to understand what [Katebian's] complaint is." (ECF No. 73-26).

Katebian responded, reaffirming that he had not, at any time, "consented to relinquish [his] control over to [Alizadeh]." (ECF No. 73-27).

Kickham responded, again asserting that he had simply recorded a document that had been provided to him. (ECF No. 73-28) ("As I wrote you last week, we did not remove you, you removed yourself.") Katebian replied that he understood Kickham's position now, and that he need to conduct his own due diligence. (ECF No. 73-29).

On February 6, 2019, at 12:49pm, Katebian emailed Missaghi. The substance of the email was addressed to Premo and Kickham. This email incorporated, in full, the pre-drafted language that Missgahi had sent Katebian days before. (ECF No 73-30).    Missaghi respond to this email, stating "Thats fine. This is what they want. Email them direct and cc me and [Alizadeh]" (ECF No. 73-31). Katebian replied, stating, "Ok, as a courtesy I am sending it to [Auerbach] just for him to see it first

7

then I will sent it to them. I won't change anything." (ECF No. 73-32). Missaghi responded, "Ok thats fine. I just sen yo [sic] a draft of the meeting. If good let me know and I will email it out." (ECF No. 73-33). Later Missaghi again emailed Katebian, saying "Please send that email, so that this is done . . ." (ECF No. 73-34).

On February 6, 2018, at 2:55pm, an email was sent from Katebian's email account to Kickham and Premo, with Missaghi, Alizadeh, Auerbach, and Wilson cc'd. This email incorporated, in full, the pre-drafted language that Missaghi had sent Katebian days before. Again, this language included an acknowledgment that "[i]t is an irrefutable fact that I do not have any interest in Liberty & York Corporation." *Id*. In Katebian's sworn affidavit, he denies sending this email. (Katebian Aff. ¶ 18) ("I did not send the February 6, 2018, *mea culpa* email . . ."). Kickham responded: "Thank you, Ben. I'm glad we were able to resolve this amicably." (ECF No. 73-36).

Things were quiet for a couple months. But, on April 6, 2018, Extensia emailed Wilson and Katebian, seeking financial information for its annual term loan review. (ECF No. 73-37). Katebian emailed Wilson, stating that he had been told that he would be off the mortgages, and asking about the status of new mortgages. *Id*.

On June 26, 2018, Katebian emailed Kickham and Premo, asking for "any update on the mortgages." (ECF No. 73-38). He sent this email by "replying" to Kickham's February 6, 2018, "thank you" email.

## PROCEDURAL BACKGROUND

On October 29, 2018, Katebian filed this lawsuit against Alizadeh, Missaghi, Wilson, and several Skymark entities. (ECF No. 1). In Count I, Katebian seeks a declaration that he is the sole owner of Liberty & York. Katebian also alleged counts for common law conversion, statutory

8

conversion, tortious interference, and civil conspiracy.

Without answering the complaint, Defendants filed a motion to dismiss and for summary judgment. As the title suggests, Defendants' motion was twofold. In the first part, Defendants moved to dismiss all claims, except Count I as to Alizadeh. In this part of the motion, Defendants argued that (1) the conversion claims should be dismissed because intangible "ownership interests" cannot be converted; (2) the tortious interference claim should be dismissed because Katebian lacks standing and does not allege that Defendants' actions were malicious or improper; (3) the conspiracy count must fail because there was no underlying tort; and (4) the corporate defendants, Wilson, and Missaghi, should be dismissed from Count I because they do not have legal interests adverse to Katebian.

In the second part of the motion, Defendants moved for summary judgment on the "entire complaint," citing the minutes and acknowledgment allegedly signed by Katebian and concluding that "he cannot possibly convince the Court that control over Liberty & York was wrested from him involuntarily." (ECF No. 11, PageID 163).

On April 31, 2019, the Court largely denied the Defendants' motion to dismiss and for summary judgment. (ECF No. 31). Specifically, the Court denied summary judgment and only dismissed Katebian's tortious interference claim. The Defendants' motion was denied in all other respects. The case proceeded to discovery.

During discovery, Defendants requested "all emails between January 1, 2018 and August 1, 2018 to or from you Troy Wilson, Edward Kickham, John Premo, Ara Missaghi, Jay Auerbach related to Liberty & York and/ or the Skymark entities." (ECF No. 73-44).

Katebian did not produce any of the emails described above. On September 5, 2019,

Magistrate Judge David R. Grand ordered Katebian to "conduct an additional search for all documents" responsive to this request and to produce any responsive documents on or before September 25, 2019. Eventually, Katebian produced the emails.

Discovery closed on October 28, 2019.[3] On November 19, 2019, the Defendants filed their motion for summary judgment. The vast majority of this motion (roughly 24 of its 30 pages) either attacks Katebian's credibility or attempts to show that the facts seem to favor Defendants. On December 16, 2019, Katebian filed a response to the Defendants' motion for summary judgment. Like Defendants' motion, Katebian's response largely disputes the facts; roughly 25 of its 29 pages lays out the factual background as he sees it. The Defendants filed a reply. The Court heard oral arguments on March 5, 2020.

## ANALYSIS

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving parties bear the burden to show that there is no genuine issue of material fact, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005); *see also Daniels v. Woodside*, 396 F.3d 730, 735 (6th Cir. 2005) ("Entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish an element essential to that party's case, and on which

---

[3]Magistrate Judge Grand allowed some discovery to occur after this date (i.e. the parties' depositions).

that party will bear the burden of proof at trial.") (citations omitted).

Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by evidence in the record, that shows there is a genuine issue for trial. *Matsushita*, 475 U.S. at 586. "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

In the relatively short section of Defendants' motion that is dedicated to legal (as opposed to factual) argument , Defendants argue that (1) the declaratory judgment claim should be dismissed because "Katebian was only a trustee in the first place [and] voluntarily returned his shares to Alizadeh in 2017;" (2) the conversion claims should be dismissed because Katebian (a) has not shown that he had any possessory right in Liberty & York , (b) has not shown that the Defendants converted his interest "to their own use;" or (c) has not shown that he suffered damage; and (3) the conspiracy claim should be dismissed for lack of an underlying tort.

Defendants also argue that Katebian's case should be dismissed as a discovery sanction because he committed perjury and failed to produce some of the requested emails in a timely manner.

In the relatively short section of Katebian's response that is devoted to legal (as opposed to factual) argument, Katebian argues that most of the documents that the Defendants cite in their motion have been forged, and that the undisputedly valid stock transfer agreement is the operative document in this case.

**I.    Validity of Contested Documents**

The resolution of Defendants' first argument is quick, and generally disposes of this motion. Defendants argue that the trust agreement, the July 14, 2017 minutes, the November 17, 2017 Acknowledgment, and the February 6, 2018 "mea culpa" email show that Katebian never was the true owner of Liberty & York, and that he undisputedly transferred any interest that he had in company. In response, Katebian provides a sworn affidavit, wherein he testifies that these documents were forged. As the Court previously recognized "whether [a] note is a forgery is a question of fact, and [c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment; rather, the evidence should be viewed in the light most favorable to the non-moving party." *Smith v. Weers*, 2018 WL 2087122 at *3, n.1 (6th Cir. January 2, 2018) (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014) (internal citations omitted)).

Essentially, Defendants ask the Court to ignore Katebian's sworn affidavit. They offer several examples of times that Katebian has seemingly contradicted himself during this case. (ECF No. 73, PageID 1539-1540). However, at this stage, the Court is unable to weigh Katebian's credibility, and his sworn affidavit provides a version of events that would invalidate the legal effect of the contested documents. Further, Katebian has provided an expert report that concludes that his signature was forged. (ECF No. 77-7). Thus, these documents cannot serve as the basis for an award of summary judgment in Defendants' favor.

Moreover, other evidence casts at least some doubt on the contested documents. For example, in October 2017, Wilson reached out to Katebian to approve a land transfer. (ECF No. 77-8). This email came more than three months after the July 14, 2017 meeting that purported to

remove Katebian's ownership and governance interests in Liberty & York. And the November 17, 2017 Acknowledgement states that, as of that date, Katebian "is the sole shareholder of [Liberty & York]" and that he had been "elected to serve on the Board of Directors as the sole Director" for the foreseeable future. (ECF No. 73-12). The unclear circumstances surrounding these documents, and Katebian's evidence regarding the possibility of forgery, creates a genuine issue of material fact for trial.[4]

## II. Conversion and Conspiracy

Defendants arguments regarding Katebian's conversion claims are equally unpersuasive. Defendants argue that Katebian cannot show that he ever had a possessory interest in Liberty & York. However, the stock transfer agreement (and Katebian's sworn testimony regarding his lack of involvement in the later documents purporting to transfer his interest back) belie that argument. And, contrary to Defendants' argument regarding Katebian's inability to prove that the Defendants' converted his property to "their own use," he points to an email from Wilson that describes the Defendants diverting Liberty & York's assets to other entities that they controlled. (ECF No. 77-8). Finally, although Defendants argue that Katebian has not substantiated his claim that he has suffered substantial damages, he has pointed to facts that (viewed in his favor) show that the Defendants deprived him of his property interest in Liberty & York for some period of time. This deprivation would be enough to support a conversion claim. *See Aroma Wines & Equip., Inc. v. Columbian Distribuition Services, Inc*., 497 Mich. 337, 353 (2015) (conversion generally encompasses any

---

[4]It should also be noted that, besides these questionable documents, Defendants point to no other document that purport to transfer Katebian's interest back to Alizadeh. For example, Defendants have not provided a stock transfer agreement, like that which was executed in August 2016.

conduct "inconsistent with the owner's property rights.")

Thus, the Court concludes that Defendants' motion raises no argument that would justify entering summary judgment in their favor on Katebian's conversion claims. And, because Defendants entire argument against the continuation of Katebian's civil conspiracy claim was that there is "no underlying tort," (ECF No. 73, PageID 1544), the Court concludes that this argument is meritless too.

## III. Spoilation Argument

Defendants ask the Court to dismiss this case as a discovery sanction because Katebian committed spoilation and perjury.

### a. Spoilation

"Spoilation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.*, 2009 WL 998402, at *1 (E.D. Mich. 2009). Defendants argue that "[g]iven the existence of the June 26 email and the emails embedded within it, the only conclusion that can be drawn is that Mr. Katebian deleted the relevant emails."

Rule 37(e) provides the relevant mechanism for evaluating claims of spoilation of electronically stored information, such as emails:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> **(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> **(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

14

>    **(A)** presume that the lost information was unfavorable to the party;
>
>    **(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or
>
>    **(C)** dismiss the action or enter a default judgment.

Notably, Rule 37(e) only applies if the information *cannot be restored or replaced through additional discovery*. Here, the emails that Defendant argues Katebian failed to disclose were *sent or received by Defendants or their corporate counsel*. Defendants likely could have found these emails through a simple search of their own email accounts. Accordingly, the Court fails to see the applicability of Rule 37 or the appropriateness of dismissal.

Moreover, even if Rule 37(e) applied (as Defendants say it does), there is no indication that Defendants suffered any prejudice, or that Katebian "acted with the intent to deprive another party of the information's use in the litigation." Thus, the Court will not dismiss this case for spoilation.

    **b.    Perjury**

Defendants point to several apparent contradictions between sworn testimony that Katebian has given in this case. (ECF No. 1538-1540). Although these contradictions are troubling, they appear better suited for impeachment than grounds for dismissal. Some may not even necessarily be contradictions. For example, one of Katebian's earlier affidavits stated that he had intended to be "in control" of the Southfield and Atlanta properties. Defendants point to some parts of Katebian's deposition that indicate that he never intended to be involved in the day-to-day management of these properties. However, the full portion of the affidavit states that, before signing onto the relevant mortgages, he believed that he would be "in control of the properties, with

15

[Wilson's] management assistance."[5] Thus, the affidavit is not necessarily inconsistent with Katebian's other sworn testimony, and it is not clear that the sworn statements identified by Defendants rise to the level of perjury. Accordingly, the Court declines to dismiss the case, on these grounds, at this time.

## CONCLUSION

Because there are currently no grounds to dismiss this case for spoilation or perjury, the Court **DECLINES** to do so. And because there are material issues of fact at the very heart of this case, the Court **DENIES** Defendants' motion for summary judgment.

**IT IS SO ORDERED**.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: March 18, 2020

---

[5]Other allegedly perjured statements do not appear to be on issues that are material to this case. For example, in Katebian's previous affidavit, he stated that he had initially been approached by Missaghi's father about signing on with Liberty & York. Defendants argue that Missaghi's father died six months before Liberty & York ever needed a Social Security number. Putting aside the fact that this testimony could easily be the result of a hazy memory or preliminary discussions about Katebian becoming involved in Liberty & York, this dispute is immaterial to the issues in this case.